The People of the State of New York, Respondent, *v.* Frances Q. Creighton and Everett C. Appelgate, Appellants.

(Argued April 30, 1936; decided May 26, 1936.)

*Elvin N. Edwards* and *Joseph Lonardo* for Frances Q. Creighton, appellant.

*Charles R. Weeks, John R. Niesley* and *George A. Gibson* for Everett C. Appelgate, appellant. 

*Martin W. Littleton,* District Attorney (*Philip Huntington* of counsel), for respondent. 

CRANE, Ch. J. The defendants Frances Q. Creighton and Everett C. Appelgate were indicted and convicted for murder in the first degree for having killed Ada Appelgate, the wife of the defendant Appelgate, on the 27th day of September, 1935, at 12 Bryant place, Baldwin, in the county of Nassau. The death was caused by arsenic poisoning. Before stating the occurrences on the fatal day it may be well to see who these people are and under what conditions they had been living.

Frances Q. Creighton and her husband John Creighton had been living for some time in a one-story and attic bungalow at 12 Bryant place, Baldwin, Long Island. The bungalow consisted on the ground floor of a living room, dining room, kitchen, two bedrooms and bath. At the front door was an inclosed porch. A stairway in the rear led to an open attic, the front part of which had been fitted up for a bedroom.

This couple were about thirty-six years of age and had two children, a daughter Ruth, fifteen years of age, a pupil in the high school, and a son twelve years of age.

John and his wife had been married seventeen years. He was employed in the county engineer's office at a salary of $166 a month. In 1928 he had become acquainted with Appelgate through membership in the American Legion. They were both members of a post in Nassau county and frequently attended its meetings and social affairs together.

Appelgate was also thirty-six years of age and had married Ada Appelgate in July, 1920. He had entered the United States service during the war on October 2, 1918. The armistice was declared the next month. He became a very enthusiastic member of the Legion and during the summer of 1935 ran for county commander of Nassau county. He was defeated. At the times here in question he was employed as investigator in the Veterans' Relief Bureau, making between twenty-five and forty dollars a week. He had a Chevrolet car which he drove around quite extensively.

Ada Appelgate was a large woman, weighing at the time of her marriage about two hundred pounds, which increased to about two hundred and sixty. This fact is only material to this case in that she was in perfect health, having been treated by a physician only to reduce. A little girl, Agnes, thirteen years of age, was the only child of this couple, and had become a friend and companion of Ruth Creighton.

Up to November 17, 1934, the Appelgates had been living with Mrs. Appelgate's father but, due to disagreements, the Creightons took them in and thereafter, up until the murder, they lived together as one family, Mr. and Mrs. Appelgate sharing one bedroom on the ground floor, and Mr. and Mrs. Creighton the other. The two girls, Ruth and Agnes, occupied the room in the attic, and the boy slept on the porch. The expenses of the household were divided between the two families, one paying a little more than the other.

Ruth Creighton testified that months before the Appelgates came to live with them the defendant Everett

Appelgate had had sexual intercourse with her which continued at various times. She states the various places throughout the county of Nassau where he performed this act while they were in his car. The relations were continued after he came with his wife and daughter to live with them. She states that on one occasion she slept in the bed with him and his wife; that they then had sexual intercourse. When in September of 1935, Mrs. Appelgate was taken to the hospital for four days, Ruth slept with Appelgate.

Ruth testifies that Appelgate told her that he loved her, and she told him that she loved him. " I know," she said, " he asked me if I would like him better if he was single." She tells of an incident when Mrs. Appelgate got out of the automobile and slammed the door, and that Appelgate jumped out of the car and went after her: " He knocked her up a bit; he banged her up a bit, and she fell down in the yard. * * * She said if that was Ruth he wouldn't have gone after her."

Appelgate as a witness in his own behalf admits his improper relations with Ruth in every particular as detailed by her except that he denies the illicit relations commenced before he moved into the Creighton home. Ruth testified that Appelgate also had improper relations with her mother.

As to these relations with Ruth the defendant Appelgate on the witness stand said: " I may say this much, her mother's own arrangement — she slept with me, in the same bed with me when the house has been crowded." Exhibit 37 is a letter which Appelgate wrote to the Assistant District Attorney De Meo, addressing him as " Dear Al." It shows that he kept track and had knowledge of Ruth's menstrual periods.

Up to this point the evidence, about which there is no dispute, shows that Appelgate was guilty of rape in the second degree, having had relations with a girl under eighteen years of age even though with her consent. His wife was in a position, if she chose, to have him arrested

and prosecuted and also to inform Mr. Creighton of the action of his daughter with her husband. That she knew of these improper relations must be self-evident; that she thought of doing something about it may be gathered from the following testimony: John Creighton testified that on one occasion, about Labor Day, Appelgate and his wife had words over some letters; that he slapped her face and pushed her down in a chair and said to her: " You have lied to me ever since I have been married to you." Whereupon she replied, " If you ever do that again I will tell something that will put you where you belong."

Mr. Creighton also testifies that on one occasion when all the family were present friends known as the Greenfields called. The defendant said to Creighton after they had gone home, " ' What do you think that fellow Greenfield said?' He said, ' If I wanted to go around with Ruth I should get an apartment and keep her there and not have her around the house, and if she got in trouble I could get a doctor to fix her up.' He said, ' What do you think of that?' " Creighton says that he was dumbfounded and afterwards, apart from the family, had a talk with the defendant, his friend, and said, " What do you mean by that, Appy? You wouldn't do anything to my daughter, would you? " To which the defendant replied, " No, sir. You know me. I would not harm a hair of her head. I think as much of your daughter as I do of Agnes."

Another incident may throw some light upon Appelgate's relations with his wife and affection for Ruth. This comes from a witness named Marjorie F. Harris, a neighbor living in Malverne, whose husband was also active in the Legion. She saw a great deal of these people. Mrs. Creighton called her on Friday morning and told her of Ada Appelgate's death and asked her to come over and help. She went on Saturday when Mrs. Appelgate was laid out in her coffin in the living room, and Mr. and Mrs. Creighton, Mr. Appelgate and his

daughter and Ruth Creighton were present. This was the conversation: " Well, they were in the kitchen — they were eating their dinner. * * * The conversation came up about Mr. Appelgate getting married again. I was really surprised. I said to Mr. Appelgate, ' Well, Appy, if you think about getting married, I think you are crazy.' With that, John Creighton said, ' Well, Appy, if you marry someone with a lot of money — and old, with one foot in the grave, why that wouldn't be so bad.' With that Appelgate turned to me and he said, ' It would be funny, Margie, if I married someone real young.' My daughter said to Ruth Creighton, ' Ruth, how old are you? ' Ruth says, ' I will be sixteen in October.' Ruth asked Florence, ' How old are you? ' Florence says, ' I will be fifteen in January.' With that, Appelgate turned to Florence and says, ' Why, Florence, are you in circulation? ' I looked at him and I says, 'Appy, I am surprised. If you are thinking about marrying anyone that young, I think you are more than crazy.' * * * Ruth Creighton was crying on her mother's shoulder. Afterwards, Mrs. Creighton says to me, ' Do you know why Ruth is crying? ' I says, ' No.' She says, ' You know, she would feel terrible if her Uncle Ev got married again.' "

The reasonable inference to be gathered from this testimony is this: Appelgate and Ruth Creighton were in love with each other. They had been living together almost as man and wife. Even when his wife was in the hospital he was carrying on improper relations in his room and bed with Ruth. The neighbors and friends noticed the relationship and remarked about it. It was open; it was apparent. Did Appelgate have a motive to get rid of his wife so that he could marry Ruth? A reasonable and natural inference to be drawn from such conduct would be that he had such a motive. Then again, was he afraid that his wife might tell what she knew? He was guilty of a felony to which he had no

defense. If his wife spoke he would be arrested and punished. Also Ruth's father, Creighton, might make trouble for him if Mrs. Appelgate spoke and told what she knew. So much for Appelgate and his relation to the Creightons.

Now as to the Creightons. In March of 1935 numerous anonymous letters were received at 12 Bryant place threatening the Appelgates, making disparaging remarks about them and telling them to get out. Appelgate turned some of these over to the police but there is no evidence that anything was done about it. Mrs. Creighton denied knowing anything about these letters up until the day she took the stand and testified in her own behalf when she admitted that she had written them for the purpose of causing her husband " to cease their staying in the house." The following are extracts from some of these letters: " We have you all on the run and if you don't do as you should with those rats at your place you should be made miserable to. * * * They are grafters I know them they lived with her people long enough for nothing. * * * Don't put any truth in what he says. We know he is a Legioner and that you are to but don't trust him. I know his wife since she was a child and we know all about her family so watch out * * * We have warned you but still you travel with him and people who do not know when they are well off get in trouble to so you have no kick if you get hurt to. * * * We will get you all yet for the trick you Appelgates played on the old man. You are yellow or you would put them out long ago. You will meet us yet and when we meet watch out. * * * Watch out for the Appelgates they are nice to your face but she talks of you to people they are only using you because they have no place to go. You are white but they are not, she's common like us we are her relatives. * * * Also the woman with dark hair his wife is a big noise and can be heard all over and those kind are only full of * * * and wind but sneaks and

cowards at heart and *we can get at her where it hurts* and she will crawl out. \* \* \* We will watch our chance and get you all. \* \* \* You are —— —— nuisances. Why don't people take a tip and clear out the Appelgates. \* \* \* We will get all. \* \* \* You will learn when you see what we do to him when we do it when our chance is right."

Joseph H. Appelgate, brother of the defendant, and a newspaper man, now given to writing crime stories principally, in July of 1935 had a conversation with Mrs. Creighton in which she said that it was not as pleasant living together with the Appelgates as he might think, and continuing said: " ' I think a great deal of Everett, he is one of the finest men I ever knew. But why he ever married that big fat wife of his is more than I can understand. I don't get along with her at all.' I said, ' Why don't you put them out? ' She looked at me and smiled in a peculiar way and says, ' Well,' she says, ' there is another way.' I said, ' What do you mean? ' She says, ' Oh, I would like to slip her some rat poison.' "

Walter C. Mayer was a friend of the Appelgates living in Bellmore, Long Island. On one occasion he had taken Mrs. Creighton to the bakery in his car. He pulled up to the curb as she wanted to talk to him, and his testimony is: "And I pulled up to the curb and stopped and Mrs. Creighton said she wished I would help her get rid of the Appelgates, that she did not want the Appelgates in her home."

In her testimony and statements Mrs. Creighton swears that Appelgate had sexual intercouse with her on various occasions in the automobile and in her bed. This he denies. Ruth had testified that her mother knew of her illicit relations with Appelgate as she had caught them in her room together. What do we gather from this to have been the feelings of Mrs. Creighton toward the Appelgates? In her testimony she says that she feared Appelgate as he held over her head the knowledge of her trial in New Jersey in 1923 and had threatened to expose

the circumstance to her children. We at least may gather from the above evidence that she wanted to get rid of the Appelgates and had a special aversion to Mrs. Appelgate. The anonymous letters may have been harmless but carry certain threats. The situation in this household was indeed complicated and could not have existed much longer without a blow-up from some direction.

We are justified in believing that Appelgate loved Ruth, also that he feared his wife might tell of his crime. Mrs. Creighton was friendly with Appelgate, perhaps more than friendly, and feared that he might tell her children and the public about her trial in New Jersey in 1923. Appelgate admits on the stand or in his statement to the District Attorney that he had been informed by a member of the Legion about the trial of Mr. and Mrs. Creighton for murder in New Jersey, and that he had spoken to John Creighton about it to assure himself that they were not guilty. He had shown some interest in this story and to this extent corroborates Mrs. Creighton when she swore that she was under his domination and was fearful that he would tell the children and the neighbors about it as he had threatened to do.

At last we come to Thursday night, September 26th. Ada Appelgate was taken violently sick that night and died the next morning as the result of arsenic poisoning. She had eleven grains of arsenic in her body, as the experts testified after the examination of her parts. A lethal dose is three grains, so that she had received more than enough to kill three persons. Only two persons were interested in her death. She was poisoned by either her husband or Mrs. Creighton or by both. Mrs. Creighton swears that she gave her the poison at the direction and under the domination of the defendant Appelgate. He says that while he gave her an eggnog at eleven o'clock Thursday night which he prepared himself after putting whisky in it, he used no poison and knew nothing about " Rough-on-rats " or arsenic having been mixed with it.

He bolstered his wife up in bed and took an hour or more to feed her the eggnog. This, Mrs. Creighton says, contained arsenic. His statement is: " Q. When you took this eggnog to your wife, how did she take it? A. My wife was in a weak condition. I found it necessary to support her back with my arm, raising her body and head off the pillow, where she would be in a condition to drink it. The drinking was accomplished through a regular hospital type straw — with a glass straw, about that shape (indicating). She took very little of it. I guess it was fully two or three hours before she got it down to possibly an inch from the bottom of it, which she never finished at all. She never took the full contents of the glass."

We shall begin, however, this period of sickness with the Wednesday of the previous week. It was that day, September 18th, that Mrs. Appelgate was taken sick and removed to the South Nassau Community Hospital on Saturday, the 21st. By the following Wednesday, September the 25th, she had fully recovered, at least the doctor in attendance said that she could take normal food. On that day she was brought home and, although confined to her bed, had recovered from the illness which took her to the hospital.

Mrs. Creighton, in one of her statements to the District Attorney, said that she had put rat poison in her coffee, in junket and in milk. On the stand, in testifying in her own behalf as a witness, she denied that she had given Mrs. Appelgate poison at any time and said that she did not know anything about arsenic or the poisonous nature of rat poison. She testifies that in the early part of September Appelgate took her in his car to a drug store on the Merrick road, known as a cut-rate drug store, and told her to get a twenty-five cent box of rat powder; that she got it and gave it to him and he put it in his pocket. Her testimony leading up to the death is this:

Shortly after dinner that night " I went to the icebox and got the milk and poured it into a glass and he gave me or handed me a powder and told me to put it in the milk. Sort of grayish white substance, a white paper.

" Q. And was it a paper anything similar to the paper shown in Exhibit 12, that I show you, the papers from the druggists? A. Similar, yes."

At eleven o'clock an eggnog was given to Mrs. Appelgate. She swears it was given by Mr. Appelgate. " He prepared it. I gave him some things for it. He put whisky in it which he got out of his room. It was in an ice tea glass. Q. What did you see see him add to it? A. A similar powder he gave me. * * * There was a glass straw in it and he was sitting down alongside of her. He was bolstering her up and feeding her."

John Creighton testified that he saw Appelgate give his wife a milk shake or a milk punch that night. " Well, I saw him going in the room from the kitchen across the dining-room and into her bedroom with it in his hand, and he was stirring it as he went along."

Everett Appelgate admits that he gave his wife an eggnog at eleven o'clock that night which he prepared himself and, as before stated, he says it took him more than an hour to give it to her. He bolstered her up in bed. He says, however, that he did not know there was any poison in it, but about three o'clock on Friday morning everybody was aroused by Mrs. Appelgate's sickness; she had diarrhea and toward morning apparently became comatose. Her eyes became glassy and her hands cold. Her husband straddled her body in the bed and commenced artificial respiration. She was dead at half-past eight. Dr. Zabin was called at 6:24 and at 7:36. No one seemed to have told him of her desperate condition. He simply advised that she be taken to the hospital. Dr. Caldwell was later called and found her dead.

The District Attorney makes some point about these telephone calls and the exact time at which they occurred. Recollection of time is so uncertain that we need not

assume that death had come before the calls. More to the point is it that after death Dr. Zabin at first refused to make a death certificate without an autopsy. Appelgate refused to permit an autopsy and the doctor gave a certificate anyhow. When summoned to the District Attorney's office a few days later Appelgate again refused to permit an autopsy but was finally persuaded to consent.

Both Appelgate and Mrs. Creighton were arrested and thereafter made statements. These statements were fairly made in the presence of doctors, and there is no question of force, violence or fear. The last confession of Mrs. Creighton was written out in her own handwriting voluntarily at her own request and sent to the Assistant District Attorney. She there states that after Appelgate had had the first act of intercourse with her in the car he said: " Listen Fran not a word of this to John do you hear, remember Jake Pettit told me about the 1923 affair & if you say a word I shall make that known by broadcasting it & if I do it may mean John's job."

These are long statements reviewing much that I have already said regarding the life of these people at 12 Bryant place. She implicates Appelgate in the manner stated.

In her first statement, on October 8, 1935, she says that Appelgate gave her a white powder and told her it was arsenic and to put it in the milk and to keep her mouth shut. She also says that on Thursday evening, September 26, 1935, at about 11:30 o'clock she saw Appelgate prepare an eggnog and put a similar white powder into it, a powder which he took from his lower vest pocket. Continuing, she states: " He said to me later that no matter if arsenic was found in Ada's body they would have a hard job later proving it had come from any of us, because nobody could say that we did it, and Ada had been in the hospital.".

The last confession is dated October 10th and 11th; the first October 8th; one comes in between these two

and is sworn to October 9th; it is an examination by an Assistant District Attorney (Mr. Strohson) in question and answer form. In this she swears to having poisoned Mrs. Appelgate by putting arsenic in coffee, junket and milk, and says that she put the rat powder in the eggnog that Mr. Appelgate gave to his wife. She also says she does not think Mr. Appelgate knew at that time that there was rat powder being administered to his wife. She said her previous statement was false and that she accused Appelgate because of his mistreatment of her daughter. All this is denied in the self-written statements of October 10th and 11th in which she tells that Appelgate was the one who did the poisoning, dropping the powder in the milk and the eggnog, to which story she adhered when she was on the stand. All of these statements were accepted simply as evidence against Mrs. Creighton, the judge cautioning the jury that under no circumstances should these confessions or statements out of court be accepted as evidence against Appelgate.

Appelgate was questioned at length on September 29th, which was Sunday. He said he did not have the slightest idea who murdered his wife, and that if there had been an attachment between Mrs. Creighton and himself there would be some motive for taking his wife's life, but there was no such attachment. It is in his statement that he states that in 1934 when he moved into the house he knew about Mrs. Creighton's background. This is what he said: "Andrew McFarland of Hempstead came to me one day in the Relief Office and asked what the —— kind of —— —— organization I belonged to that would have a louse like this guy belong to it. I asked him what he meant. He replied, ' Don't you know that fellow was a murderer? He and his wife are both murderers? ' * * * The next meeting with Creighton I put it up to him. He promptly said it was the truth, they had been indicted in 1923, and had been exonerated. Q. Did he tell you any of the details, what the basis of

the charge was? A. He did in a very brief manner. He told me Mrs. Creighton's brother committed suicide."

Appelgate in his testimony says that it was Mrs. Creighton if any one who bought the " Rough-on-rats " at the drug store. He admits going there with her. He also admits about his refusal to have an autopsy until persuaded by the District Attorney. He admits the conversation about marrying again when his wife was dead in the next room. He also admits on the stand that he had been told and knew all about the trouble in New Jersey, and uses this expression: " I confronted John with it." He admits about the sexual relation with Ruth and that it was a practice that obtained almost every other day, with few exceptions.

Counsel for Mrs. Creighton, when she was on the stand as a witness, took up the Strohson examination of October 9th, wherein she had exonerated Appelgate. She denied categorically that these statements exonerating him were true and virtually explains them by saying that her mind had snapped and that she was worried about her daughter being locked up. On cross-examination the District Attorney asked Mrs. Creighton why she had not complained to her husband about Appelgate's assault on her in the automobile on the first occasion. She had testified that it was against her will and resistance. " Q. What was it that held you back? A. Because Appelgate had threatened to expose the trouble we had in 1923 if I ever made mention of it.

" Q. Is that what kept you fearful of him all the way through, I take it? A. Yes.

" Q. And that is the dominating influence he held over you? A. Yes."

She further testified on cross-examination that she did not know that " Rough-on-rats " was a deadly poison. " Q. And you had never known that " Rough-on-rats " was poison or arsenic? A. No, I did not know." She further testified under cross-examination that when the

milk was given to Mrs. Appelgate she knew that there was a dose of arsenic in the milk because Appelgate had told her so and that was the only way she knew. " I had no knowledge of arsenic. I only knew it was arsenic because he said so. Q. You never told the doctor? A. No." Again, she said that most of the statements in the Strohson confession where she left out Appelgate were suggested to her. " In that statement practically everything was suggested to me."

Thus we have Mrs. Frances Creighton testifying against Appelgate. It was he who gave the poison to his wife in the milk and in the eggnog. He dominated Mrs. Creighton; she was afraid of him. She did not dare tell her husband because Appelgate had threatened to expose the fact of her trial in New Jersey in 1923.

The District Attorney refrained from asking her on cross-examination what it was that Appelgate threatened to expose. At no time or place did the District Attorney bring out anything about the previous trouble in 1923 in New Jersey. It was strange indeed that if Mrs. Creighton was forced to do all these things she did not tell someone. Her reason for not doing so, which seems quite plausible, is that Appelgate threatened to expose her about some trouble in 1923. She gives this as a reason herself, voluntarily. The District Attorney would have been justified in asking her what this trouble was which Appelgate threatened to expose, but he did not do so.

However, when Appelgate's lawyer commenced to cross-examine Mrs. Creighton, he had a perfect right to show not only that her testimony was false but that she had no fear of exposure of any trouble by Appelgate. He did this by asking Mrs. Creighton if she had written a letter to Joseph Appelgate, the defendant's brother, in July of 1935, addressed to 909 Maple avenue, Ridgewood, N. J., wherein she sought to sell him a story for the True Detective magazine, wherein she detailed the events of her trouble in New Jersey, and requesting him to use

fictitious names or give the names of her children's grand-mother and grandfather. A certain portion of this correspondence was placed in evidence. This testimony was perfectly competent. Appelgate's attorney could thus cross-examine Mrs. Creighton to show that she had no fear of exposure of any trouble in 1923, because she had just a few months before tried to sell the story to a story writer.

Mrs. Creighton had testified that she knew nothing about arsenic or rat poison. The attorney for Appelgate was justified in questioning her about another trial in which she had learned all about arsenic, about rat poison-ing and its deadly effect. The fact that she was the defendant in such a trial could not keep out such com-petent evidence. Even then no one knew what the trial was about in New Jersey until counsel for Mrs. Creighton, on re-examination of his client, said: " Q. Both you and your husband were tried in Jersey and acquitted on that charge, were you not [arsenic poisoning]? A. We were." Continuing, counsel showed that Mrs. Creighton had kept the information of her trial in 1923 from her children, and that Mr. Appelgate knew all about the matter, and that he had gotten the information from a Mr. Pettit, one of the officials of the American Legion. The District Attorney was not in on this at all.

Mrs. Creighton had accused Appelgate and Appelgate had accused Mrs. Creighton, at least tried to exonerate himself for the death of Mrs. Appelgate. The testimony brought out by the defendants' counsel was competent and bore upon the question, *first*, of Mrs. Creighton's fear of Appelgate and her domination by him, and, *second*, her knowledge of arsenic and of the poisonous nature of " Rough-on-rats." Evidence which is relevant and per-tinent never becomes incompetent simply because it relates to another trial. Anyhow, the District Attorney did not bring out this testimony. He had a right, how-ever, to take up the matter where these counsel left it and continue his cross-examination further as he did.

At this point in the trial the court took pains to instruct the jury at the request of Mrs. Creighton's attorney that the jury were to disregard all evidence regarding the New Jersey trial except as it bore upon her knowledge and credibility. Otherwise it was of no consequence.

There is another reason why the Joseph Appelgate evidence became important and competent. Whatever relations Mrs. Creighton had with Ada Appelgate could be shown by either the People or the defendants. This letter to Joseph Appelgate was written at the suggestion of Mrs. Appelgate, the dead woman. She and Mrs. Creighton were to share the price paid for the story. The two women had talked it over and the letter and correspondence were instigated by Mrs. Appelgate. So Mrs. Creighton swears. Surely it was competent to show that the dead woman knew all about Mrs. Creighton's previous murder trial, and that Mrs. Creighton was seeking to make money out of it. Her attitude toward such things and her lack of fear were all elements in this case.

Mrs. Creighton, on cross-examination, said: "Everything I have said about him is true. He is the one who is really to blame in the whole thing. I will admit I should not have done what he asked me to, but what could I do under those conditions?"

We have outlined the relations of these parties, the sordid conditions under which they lived, their motives, their fears, and now their accusations. That Mrs. Creighton is guilty — has been proved guilty beyond a reasonable doubt — there is no question. As to Appelgate the jury were justified in finding him guilty. He had reason to fear his wife. His motive for disposing of her is apparent. Ruth and he were in love with each other, and his conduct speaks for itself.

The condition of affairs at 12 Bryant place, Appelgate must have known could not last very long. Either Ruth would become pregnant or her father find out the facts. Appelgate evidently wanted to marry Ruth. Marriage

was talked over and Ruth was crying about it before Mrs. Appelgate was in her grave. The conduct of the defendant showed that he had no fear of consequences and at least no love or affection for his wife. She had threatened to expose him. He had committed a State's prison offense. The night the rat poison was bought he went to the drug store with Mrs. Creighton. He admits giving her money for the price of the purchase. He admits giving his wife the eggnog and taking a very long time to do it, an hour or more before she could get it down. He kept feeding it to her. He declined to have a *post mortem* and was not at all interested in finding out whether a crime had been committed.

There only remains the judge's charge to be considered. He cautioned the jury not to use the confessions as evidence except as against the one making them. He correctly charged the law regarding accomplices by calling attention to the fact that if the testimony of Mrs. Creighton is to be taken then she was an accomplice of the defendant Appelgate in the commission of the murder, and he cannot be convicted unless there be other evidence tending to connect him with the crime. The judge said: " With respect to the testimony given on the witness stand by the defendant Creighton, so far as it may tend to connect the defendant Appelgate with the commission of the crime charged, I charge you that she is an accomplice as a matter of law, and that you cannot convict the defendant Appelgate upon her testimony alone, unless you find that her testimony is corroborated by other evidence which tends to connect Appelgate with the commission of the crime."

He also cautioned the jury about the proper use of the evidence as to the sexual relations, all of which was to be considered simply as bearing upon the question of motive. And he again cautioned the jury regarding the matters brought out as to the cases in the State of New Jersey, and stated correctly the purpose of such evidence: " That

proof was not admitted and cou'd not be admitted for the purpose of proving that the defendant Creighton was in any way guilty in such case or cases. She is not on trial for that. As a matter of fact, the proof here is that she was acquitted." Mrs. Creighton's counsel requested: " I ask your Honor to charge that from the facts adduced, whatever they were in this case, as to the Jersey trial, the jury must draw no inference as to the guilt or innocence of the defendant on that charge."

After a careful examination of the evidence in this case and the rulings of the trial court we can find no reason for disturbing the verdict of the jury and, therefore, affirm the conviction of both defendants.

The judgment of conviction of each defendant should be affirmed.

LEHMAN, O'BRIEN, HUBBS, CROUCH, LOUGHRAN and FINCH, JJ., concur.

Judgments of conviction affirmed.